UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

OK FOODS, INC.                                                          PLAINTIFF

v.                               No. 2:19-CV-02031

CONTINENTAL CARBONIC                              DEFENDANT/THIRD-PARTY
PRODUCTS, INC.                                                         PLAINTIFF

v.

AES SHADY POINT LLC                                    THIRD-PARTY DEFENDANT

**OPINION AND ORDER**

Before the Court is Third-Party Plaintiff Continental Carbonic Products, Inc.'s ("CCPI") motion for partial summary judgment (Doc. 54), statement of facts (Doc. 55), and brief in support (Doc. 56). Third-Party Defendant AES Shady Point LLC ("AES") filed a response (Docs. 59 and 61)[1]. AES also filed a motion for partial summary judgment (Doc. 62), brief in support (Doc. 63), and statement of facts (Doc. 64). CCPI filed a reply (Doc. 68) in support of its motion and a response (Doc. 70) and statement of facts (Doc. 71) in opposition to AES's motion for partial summary judgment. AES then filed a reply (Doc. 73) to CCPI's response. For the reasons set forth below, CCPI's motion for partial summary judgment is granted in part and denied in part and AES's motion for partial summary judgment is denied.

**I.      Background**

This action arises out of Plaintiff OK Foods Inc.'s ("OK Foods") destruction of poultry products due to dry ice contamination and an agreement between CCPI and AES for the manufacture and sale of the dry ice ultimately used by OK Foods. CCPI is a manufacturer and

---

[1] AES also filed sealed exhibits in support of their response (Doc. 60).

distributor of dry ice, liquid carbon dioxide, and dry ice blasting equipment. AES owns and operates an electricity generation facility. On July 3, 2007, AES and CCPI entered into an agreement for AES to manufacture dry ice that CCPI would purchase weekly. CCPI then entered into a separate agreement with OK Foods on April 16, 2018 to sell dry ice to OK Foods for use in poultry processing operations. CCPI later guaranteed OK Foods that sublimation testing[2] was completed once per shift.

The agreement between CCPI and AES required AES to sell "food grade dry ice pellets" to CCPI each week. CCPI and AES agreed to indemnify each other for damages resulting from willful misconduct. Because AES's primary business is as an electricity generation facility, the agreement also contained a provision that CCPI would help AES manufacture the dry ice:

> [CCPI] agrees to provide its engineering and technical assistance to assist [AES] in optimizing its conversion rate from liquid CO2 to solid CO2, and to allow [AES] access to [CCPI's] dry ice producing facilities. [CCPI] further agrees to provide [AES] with its available knowledge and expertise to assist [AES] in manufacturing food grade dry ice pellets. This includes, but is not limited to, clean transport boxes, testing procedures of produced pellets, on site instruction as requested by [AES], maintenance procedures on pelletizers, and so on.

(Doc. 64-3, pp. 2-3, ¶ 7). After execution of the agreement, CCPI inspected AES's dry ice manufacturing facility regularly. (Doc. 59, p. 3, ¶ 6). After these inspections, CCPI would recommend manufacturing or production changes to AES. *Id.* at pp. 3-8. CCPI's recommendations encompassed all aspects of production to prevent contamination of the dry ice product. (Doc. 60-4).

After one such inspection on May 25, 2016, CCPI reported there were "no signs of sublimation testing." (Doc. 60-3, p. 3). AES alleges CCPI did not make a recommendation for

---

[2] Neither party provided the Court with an explanation of the sublimation testing process, but in its reply, CCPI explains sublimation is "allowing the dry ice to melt and turn to vapor." (Doc. 68, p. 7).

sublimation testing following the May 25, 2016, inspection even though its nonperformance was noted in the report. In addition to inspections, CCPI also required AES to complete an "Annual Supplier Questionnaire" which contained questions regarding the manufacturing process and facilities at AES. (Doc. 59-7). The questionnaire did not mention sublimation testing. CCPI again inspected AES on August 23, 2017, and did not recommend sublimation testing to AES. According to AES, no recommendation of sublimation testing was ever made to AES by CCPI and AES was unaware of CCPI's agreement with OK Foods to conduct sublimation testing.

Pursuant to the agreement, CCPI received boxes of dry ice pellets from AES on August 30, 2018. The boxes were visually inspected by CCPI's driver to ensure the boxes were sealed, free of apparent defects, and had the correct box numbers. The dry ice was then delivered to OK Foods in Fort Smith, Arkansas. OK Foods notified CCPI on August 31, 2018, that several lots of OK Foods chicken products had been contaminated by the dry ice. OK Foods alleged the contamination was caused by a "dark or black plastic material." It was determined the material was a plastic wear band that broke apart. There is no dispute that the material found was due to "premature wear of one wear band" in a manufacturing machine owned or operated by AES. (Doc. 55, p. 4, ¶ 10). Because of the wear band material in the chicken products, OK Foods destroyed more than 300,000 pounds of chicken products.

On August 31, 2018 CCPI notified AES that foreign material was found in the dry ice. CCPI requested AES examine their machines to ensure "quality is clear and . . . make sure all the machine shrouds are in good shape and the ice is covered." (Doc. 60-7). CCPI further asked AES if AES inspected the boxes of dry ice for foreign material during the "box filling process" and mentioned that CCPI does sublimation testing every twenty-four hours. *Id.* AES alleges CCPI never instructed them to stop manufacturing dry ice after the foreign material was found by OK

Foods. AES further alleges CCPI never instructed AES to conduct sublimation testing or to inspect the wear band material. With the sublimation testing or inspection of wear band material, AES alleges the material would not have gotten in the dry ice.

Prior to filing a lawsuit, OK Foods sent CCPI a letter informing CCPI of OK Foods' intent to file a claim. (Doc. 54-9, p. 2). CCPI then sent AES a letter seeking "full and complete indemnification" because the contamination was "caused exclusively and wholly by AES . . . ." (Doc. 54-9, p. 1). On October 5, 2018, AES denied any obligation to indemnify CCPI. OK Foods sent a second letter to CCPI regarding OK Foods' alleged damages and CCPI sent the damages letter to AES. On December 5, 2018, CCPI sent another letter to AES alleging AES was liable under Arkansas and Oklahoma law. AES again denied any duty to indemnify CCPI in a letter on December 21, 2018.

OK Foods filed a complaint in this Court against CCPI on February 19, 2018, alleging claims for breach of contract, breach of express warranties, breach of implied warranties, strict liability, products liability, and unjust enrichment. CCPI filed an answer on March 13, 2019. On March 25, 2019, CCPI filed a third-party complaint against AES alleging AES had a duty to indemnify under Arkansas law, Oklahoma law, and the contractual indemnity provision. On October 4, 2019, AES filed an amended answer and counterclaim asserting breach of contract and indemnification claims against CCPI. (Doc. 69).

CCPI then filed motion for partial summary judgment arguing that because Oklahoma law applies to the contract between it and AES, 12 Okla. Stat. § 832.1(A) requires AES, as the manufacture, to indemnify CCPI, the seller. AES also filed a motion for partial summary judgment arguing the indemnification provision in the agreement waived the statutory indemnification, and

alternatively, because CCPI was negligent in its failure to inform AES of the need for testing, an exception to the Oklahoma indemnification statute applies.

**II.     Legal Standard**

On a motion for summary judgment, the burden is on the moving party to show that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The same standard applies to cross-motions for summary judgment, with each motion reviewed in its own right and each opposing party "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983). Once the movant has met its burden, the nonmovant must present specific facts showing a genuine dispute of material fact exists for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In order for there to be a genuine dispute of material fact, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

**III.    Discussion**

  **A.     Choice of law**

"Federal district courts apply the choice of law rules of the state in which they sit when jurisdiction is based on diversity of citizenship." *See Baxter Int'l, Inc. v. Morris*, 976 F.2d 1189, 1195 (8th Cir. 1999). In Arkansas, if parties have included a choice of law provision in the contract, the provision will be enforced as long as it is reasonably related to the transaction between them and does not violate a fundamental public policy. *Guardian Fiberglass, Inc. v. Whit Davis Lumber Co.*, 509 F.3d 512, 515 (8th Cir. 2007).

The agreement between AES and CCPI contains a choice of law provision that the agreement "shall be construed and interpreted in accordance with the laws of the state of Oklahoma." (Doc. 64-3, p. 5, ¶ 15). The relationship between CCPI and AES has occurred entirely within Oklahoma. AES's electricity generation facility is located in Panama, Oklahoma, CCPI received the dry ice in Oklahoma, and the agreement was executed in Oklahoma. CCPI and AES's dry ice transaction is related to Oklahoma and there is no evidence that the choice of law violates a fundamental public policy, so Oklahoma law will apply to the contract dispute.

B.   **Statutory indemnification**

Under Oklahoma law, in products liability actions, a manufacturer must indemnify an innocent seller. 12 Okla. Stat. § 832.1(A). The indemnification statute provides "a manufacturer shall indemnify and hold harmless a seller against loss arising out of a product liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission, such as negligently modifying or altering the product, for which the seller is independently liable." *Id*. Under the statute, a manufacturer's duty to indemnify begins when a plaintiff files a products liability action against the seller. *Honeywell v. GADA Builders, Inc.*, 271 P.3d 88, 95 (Okla. Civ. App. 2011). The duty to indemnify under the statute applies "in addition to any duty to indemnify established by law, contract, or otherwise." 12 Okla. Stat. § 832.1(A). However, if the seller is independently liable for the loss, the manufacturer does not have a duty to indemnify. *See Honeywell*, 271 P.3d at 99.

CCPI argues AES has a statutory duty to indemnify CCPI because OK Foods filed a products action against CCPI and AES is the manufacturer. OK Foods's complaint against CCPI is a products liability action because OK Foods has alleged both a strict liability cause of action

and a products liability negligence cause of action against CCPI. Based on OK Foods's complaint, the statutory duty to indemnify applies.

AES argues that statutory indemnification does not apply in this case because the sales agreement between AES and CCPI waived the statutory duty to indemnification. Under Oklahoma law, a statutory right can be waived by agreement. *Murphy Oil U.S.A., Inc. v. Wood*, 438 F.3d 1008, 1013 (10th Cir. 2006). Waiver is the voluntary and intentional relinquishment of a known right. *Id.* (citing *Barringer v. Baptist Healthcare of Okla*, 22 P.3d 695, 700 (Okla. 2001)). Waiver may be either express or implied. *Id.* An implied waiver must be a "clear, unequivocal and decisive manifestation of the party's relinquishment of the right." *See Barringer*, 22 P.3d at 701.

The mutual indemnification provisions in the sales agreement provide:

> [CCPI/AES] hereby agrees to fully indemnify, save harmless, and defend [AES/CCPI] and its affiliates from and against any and all losses, costs, damages, injuries, liabilities, claims, liens, demands, taxes, penalties in any manner arising out of or in connection with the sale or use of said goods and resulting from any willful misconduct of [CCPI/AES], its employees or subcontractors.

(Doc. 64-3, p. 4, ¶ 12). As written, the provision does not contain an express waiver of the indemnification statute, nor does any other provision in the agreement. The indemnification provision contains the only mention of indemnification in the sales agreement. Nor does the indemnification provision imply waiver of the indemnification statute. The indemnification provision addresses only willful misconduct and does not foreclose indemnification for other reasons, including those identified by the indemnification statute: negligent acts and other actions giving rise to independent liability. Furthermore, the indemnification provision encompasses categories of loss to be indemnified on the basis of loss in addition to those categories of loss identified in the statute, so the absence of other categories of conduct in the indemnification provision does not imply the parties' intent to waive indemnification for those categories of

7

conduct. Rather, it implies the parties' intent to supplement the statutory indemnification for willful misconduct. Oklahoma's indemnification statute has not been waived by the sales agreement, either expressly or implicitly, and so it applies to the dispute between CCPI and AES.

### C. Statutory Indemnity Exception

Although the indemnification statute has not been waived, the application of the exception remains a question of fact for the jury. A manufacturer does not have a statutory duty to indemnify a seller if the loss is "caused by seller's negligence, intentional misconduct, or other act or omission, such as negligently modifying or altering the product, for which the seller is independently liable." 12 Okla. Stat. § 832.1(A). This exception is "established by a finding that the seller's independent conduct was the cause of the plaintiff's injury." *Honeywell*, 271 P.3d at 99 (finding Texas law regarding similar statutory indemnity persuasive). Manufacturers must indemnify innocent sellers, but sellers must "bear the damages and expenses they cause." *Id.* at 98 (citing *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 88 (Tex. 2001)). The exception applies "only if the manufacturer proves that the seller's independent conduct caused the plaintiff's injuries." *Id.*; *see also Stephenson v. Caterpillar Inc.*, 2019 WL 498337, at *6-8 (E.D. Tex. Feb. 8, 2019) (denying summary judgment because manufacturer set forth evidence of seller's involvement in designing product which created a question of fact as to application of statutory indemnity exception); *Charles Mach. Works, Inc. v. Butler Rental & Sales, Inc.*, 327 S.W.3d 779, 787 (Tex. App. 2010) (finding exception did not apply because manufacturer failed to present evidence of seller's culpable conduct or causation).

AES argues the duty to indemnify does not apply because CCPI was negligent by failing to tell AES to perform sublimation testing or the potential for the wear band to break and this failure caused OK Food's harm. Whether under Oklahoma law or Arkansas law, cause is a

question of fact. Here there is a genuine dispute regarding that fact. As the manufacturer, AES has the burden under the indemnification statute to show CCPI independently caused the loss. AES has presented evidence that would allow a reasonable jury to return a finding that CCPI caused the loss. According to the record, CCPI is a leading manufacturer of dry ice and AES had never manufactured dry ice prior to the agreement. Because AES's primary business is energy generation, AES alleges it relied on CCPI to provide AES with instruction and guidance regarding dry ice manufacturing. The agreement between CCPI and AES required CCPI to provide this assistance, and CCPI provided information to AES during the entire relationship. CCPI performed multiple inspections of the entire manufacturing process at AES's facility and sent recommendations to AES after each inspection. AES made changes based on these recommendations. Although CCPI made several recommendations to AES, the record does not show that CCPI recommended AES do sublimation testing, nor does it show CCPI informed AES that the wear band on the machine could disintegrate. AES argues CCPI had knowledge of wear band disintegration and the need for sublimation testing but did not provide its available knowledge. Because of the previous recommendations and changes, a jury could find AES would have done sublimation testing or tested the wear band upon recommendation by CCPI. A reasonable jury could also find that with sublimation testing or testing of the wear band for disintegration, the contamination of the poultry products would not have occurred.

CCPI argues AES had knowledge of sublimation testing because AES's president sent an email with an attachment that mentioned sublimation testing. The email was about new "requirements to track tools and parts to ensure nothing ends up in the product." (Doc. 68-1, p. 1). A copy of what CCPI refers to as "CCPI standard operating procedure" was attached. The operating procedure lists a host of procedures to detect foreign material in pellet production. One

procedure is a pellet quality check, which should "be performed every shift on every pellet machine" and requires a pellet sample to be "completely sublimated." (Doc. 68-1, p. 8). CCPI argues that this email containing the operating procedure demonstrates AES was aware of sublimation testing and quality control measures for dry ice. Although the operating procedures do include mention of sublimation testing, this operating procedure is not specific to AES and appears to be a blanket operating procedure that CCPI follows. Further, the email from AES's president mentions the procedures are "examples" of "additional new policies/practices." (Doc. 68-1, p. 1). There is no statement that AES was going to follow the attached operating procedure exactly or was told to follow the procedure. If anything, the email clarifies that a dispute of fact surrounding CCPI's alleged failure to inform AES of sublimation testing remains for the jury.

CCPI also argues the exception to the indemnification statute does not apply because AES failed to prove CCPI was independently liable for OK Foods' alleged harm. According to CCPI, AES alleges CCPI did not inspect the dry ice after the dry ice was manufactured but fails to show CCPI is independently liable. However, AES has instead argued CCPI was negligent in providing knowledge and expertise to AES regarding dry ice manufacturing. The exception applies when a seller's culpable conduct caused the injury. *See Fresh Coat, Inc. v. K-2, Inc.*, 318 S.W.3d 893, 900-02 (Tex. 2010) (explaining if the seller tortuously causes a loss, the exception applies); *see also Meritor*, 44 S.W.3d at 91 (finding the legislative intent of statutory indemnity was to indemnify sellers "as long as the seller was not negligent or otherwise at fault"). Although AES did not use the words "independently liable," they have presented facts that CCPI's failure to recommend sublimation testing resulted in the contaminated chicken product because AES would have performed any recommended tests. It is a question of fact for the jury to determine if CCPI was negligent and caused OK Foods' alleged injury.

## IV. Conclusion

IT IS THEREFORE ORDERED that AES's motion for partial summary judgment is DENIED and CCPI's motion for partial summary judgment is GRANTED IN PART and DENIED IN PART. CCPI's motion is granted to the extent that the Court finds Oklahoma law applies to the indemnification dispute between AES and CCPI and Oklahoma's statutory indemnification was not waived by the sales agreement between them. The motion is otherwise denied and this matter remains pending for trial.

IT IS SO ORDERED this 26th day of November, 2019.

*/s/ P. K. Holmes, III*
P.K. HOLMES, III
U.S. DISTRICT JUDGE